## IN THE MATTER OF THE DISCIPLINE OF JOHN E. GOODRICH

(216 N.W.2d 557)

(File No. 11085. Opinion filed April 1, 1974)

Order denying petition for rehearing May 7, 1974

---

Charles Poches, Jr., Fort Pierre, **Blaine Simons, Claude A. Hamilton,** Sioux Falls, **Robert B. Looby,** Martin, for John E. Goodrich.

**R. James Zieser,** Sp. Asst. Atty. Gen., Tyndall, for State of South Dakota.

ANDERST, Circuit Judge.

A formal complaint was filed in this court on the 3rd day of February, 1972, charging John E. Goodrich with two different charges of dishonest and unprofessional conduct as an attorney at law. The accused filed an answer, and this court thereupon appointed the Honorable R. F. Manson, one of the judges of the Third Judicial Circuit, as referee to try the issues raised by the pleadings. Trial of the matter was held on June 10, 1972. The referee filed his Findings of Fact and Recommendations with this court on the 3rd day of July, 1973, discharging the Bosanco charge, sustaining the Ferguson charge and recommending that the accused be permanently disbarred from the practice of law. The accused filed exceptions thereto that were orally argued by his counsel. The special assistant attorney general appeared and announced that by reason of an action pending in the United States District Court (see note 3, infra) he would not argue or participate further herein.

The pertinent facts surrounding the charge sustained by the referee are as follows: During the early part of 1968 Dr. James S. Ferguson of Murdo, South Dakota, was charged by the attorney general's office with approximately thirty-five counts of felonies and approximately fifteen counts of misdemeanors concerning his practice of medicine. Doctor Ferguson retained the accused, John E. Goodrich, to represent him in his defense. Bond was originally set at $25,000. Later the amount of the bond was reduced to $20,000. The doctor could not personally raise the bond, nor could he procure a commercial bond. Contact was made with the doctor's brother, John Ferguson, an Australian rancher, requesting that he send the necessary bond money for his brother. Thereupon, John Ferguson transmitted the sum of $25,000 to the Lyman County Bank, Kennebec, South Dakota, with a letter of transmittal specifying that such sum was to be used only for bail bond purposes. The money was deposited on April 11, 1968, in a special checking account designated as "J. Ferguson Special Bond Account", and the accused signed a signature card giving himself sole access to the account.

At this same time, some of the friends of the doctor in the Murdo, South Dakota vicinity had contributed and solicited others for contributions that totaled in excess of $2,700 to be used in the doctor's defense. This money was deposited in a special checking account in the Draper State Bank subject to disbursement by Mrs. Delores Iversen and Mr. H. R. North.

On April 11, 1968, the accused drew and signed two checks on the J. Ferguson Special Bond Account in the Lyman County Bank, one in the sum of $18,101, payable to the Lyman County Bank, and the other in the sum of $1,900, payable to cash. In return he received a cashier's check in the sum of $18,100 payable to the clerk of courts of Jones County, South Dakota, and $1,900 cash. [1]

The accused then contacted Mr. North who, in turn, contacted Mrs. Iversen, who related it thus in her testimony:

"Q Do you remember the day the bond was posted for Doctor James Ferguson so you could get him out of jail?

---

1. The bank charged a $1 fee for issuing the cashier's check.

"A   Yes, I do.

"Q   And do you remember who came to you or how you were contacted about this?

"A   I believe Mr. Goodrich called Mr. North and Mr. North called me and asked me if I would be ready to go to Draper and get enough money and *finish the bond.* (emphasis supplied)

\*   \*   \*   \*   \*   \*

"Q   Do you remember any of the conversation preliminary to your drawing out the money from this account?

"A   All real excited and just the feeling we were at least going to finally get him out and then they said we needed the $1,800.

"Q   Was it 19 or 18?

"A   Nineteen.

"Q   Nineteen hundred dollars?

"A   Yes.

"Q   Do you remember who said that?

"A   John (Goodrich)."

Mrs. Iversen then drew and signed a check payable to the Draper State Bank in the sum of $1,901. In return she received a cashier's check in the sum of $1,900 payable to the Jones County clerk of courts. [2] She gave this check to the accused who deposited it and the $18,100 cashier's check with the Jones County clerk of courts. Doctor Ferguson was then released from jail.

Prior to this time Doctor Ferguson wanted the accused to obtain co-counsel, and because of the severity of the charges and the number thereof the accused agreed that George Johnson of

---

2.   Here again, the bank charged a $1 fee for issuing the cashier's check.

Johnson & Johnson, Gregory, South Dakota, should assist on the case. After the release of Doctor Ferguson, the accused gave $950 cash to the firm of Johnson & Johnson as a retainer and payment on attorneys' fees. He retained the other $950 as payment towards his fees and expenses.

Evidence was that the remaining funds in the special "Iversen-North Account" in the Draper bank were used for Doctor Ferguson's personal and legal expenses. Control over the remainder of the money, as well as the bond money from the "J. Ferguson Special Bond Account" that was refunded by the Jones County clerk of courts, was turned over to Doctor Ferguson by the accused with the consent of John Ferguson, and this money was used by Doctor Ferguson for his personal needs. The accused contends that his actions in light of the foregoing were only bookkeeping entries and that he did nothing dishonest or unprofessional.

The Canons of Professional Ethics of the State Bar of South Dakota in force and effect in 1968 read in pertinent part as follows:

"11.  Dealing With Trust Property.

"The lawyer should refrain from any action whereby for his personal benefit or gain he abuses or takes advantage of the confidence reposed in him by his client.

"Money of the client or collected for the client or other trust property coming into the possession of the lawyer should be reported and accounted for promptly, and should not under any circumstances be commingled with his own or used by him."

By the above described acts, the accused procured $21,900, which was $1,900 in excess of the required bond and which $1,900 was procured through accused's deceit, fraud and misrepresentation. The money in the "J. Ferguson Special Account" was specifically limited for bond purposes only, and the money given to the accused by Mrs. Iversen was to "finish the bond." All moneys received by the accused were thus given to him in trust

for a specific purpose—to deposit as bond for Doctor Ferguson. The accused in violation of this trust procured and appropriated $1,900 of bond money for his own purposes. The fact that some or all of this money may have been or was later used for other purposes is immaterial and is no defense to this proceeding. This court and other courts have held that the intent to repay the money taken or to put the money to a use which may later be authorized has no bearing on the actions taken at the time the money was misappropriated or collected. In Re Kaas, 39 S.D. 4, 162 N.W. 370. Failure of the Grievance Committee or the attorney general to file a complaint as to the Ferguson charge in August 1970 does not affect the merits of that charge.

The referee further found, and the record supports such finding, that the accused during the hearings was less than forthright, that he frequently evaded direct answers to questions, and that he similarly gave complex and unresponsive answers to plain questions susceptible of simple answers. Such actions on the part of the accused are pertinent to the issue under consideration.

■ The accused is not a young or inexperienced attorney, having first been admitted to practice law on August 29, 1946. He continually practiced law in this state until his disbarment on September 24, 1959 (In re Goodrich, 78 S.D. 8, 98 N.W.2d 125). On November 17, 1965, he was reinstated to the practice of law by this court and has practiced to date. The prior record of an attorney may be considered in determining the appropriate discipline. Simmons v. State Bar of California, 2 Cal.3d 719, 87 Cal.Rptr. 368, 470 P.2d 352.

These proceedings are not to administer punishment for criminal misdeeds but to exercise the court's power to make it impossible for men whose honesty and reliability as members of the legal profession have been certified to by this court and who have wronged their clients' trust to commit further wrongs toward those who may seek their services. In Re Kaas, supra. The practice of law is a qualified right granted upon demonstration of legal fitness and satisfactory moral character. To continue in the enjoyment of this right one must maintain this fitness and character. State ex rel. Rice v. Cozad, 70 S.D. 193, 16 N.W.2d 484. The purpose of disbarment is to guard the administration of

justice and to protect the courts, the profession and the public from those practitioners who have failed to maintain the required fitness. In Re Hosford, 62 S.D. 374, 252 N.W. 843. If that protection requires that a lawyer be disbarred or suspended it almost always results in hardship to him and his family. This naturally makes these cases unpleasant.

■ Although the accused did not raise any constitutional questions in the hearing before the referee or in his objections to the referee's report, he did raise certain constitutional questions in his brief filed in this court. We have considered those questions, together with his challenge to the constitutionality of our disbarment procedures, on their face and as applied to him in this proceeding, as set forth in his complaint in his action in United States District Court (see footnote 3, infra), and we have concluded that the constitutional claims raised by accused are without merit.

■ The unfitness of John E. Goodrich to continue in the practice of law having been established by the clear preponderance of the evidence, we are of the opinion that a judgment of permanent disbarment against the accused as recommended by the referee should be entered.[3]

It is so ordered and adjudged.

---

3.  During a two-week period of arguments scheduled by the court, oral arguments in this proceeding as to the Findings of Fact and Recommendations of the referee were set for, and heard on, September 27, 1973. On that morning a Summons, Complaint and a Motion for Temporary Restraining Order in an action titled In the United States District Court, District of South Dakota, Central Division, naming John E. Goodrich as plaintiff and the Supreme Court of the State of South Dakota, The State Bar of South Dakota, and Kermit A. Sande, Attorney General of South Dakota, as defendants, together with a Notice thereon that the Motion would be heard on September 26, 1973, at 10 a.m. at Aberdeen, South Dakota, were served on the Chief Justice of this court. Obviously, the court could not, and did not, appear at that hearing. We are advised no such temporary restraining order was entered against the court, though some direction or order may have been entered against the other named parties. This situation may account for some of the delay in the writing and filing of the court's opinion in this proceeding. At a later date, an Answer, including Motions to Dismiss, was filed by the court, and thereafter counsel did appear for the court, and on the Motions made the plaintiff's action was dismissed on February 13, 1974, by the United States District Court.

BIEGELMEIER, C. J., and WOLLMAN, J., concur.

WINANS and DUNN, JJ., dissent.

ANDERST, Circuit Judge, sitting for DOYLE, J., disqualified.

DUNN, Justice (dissenting).

I am in agreement with the majority that our disbarment procedures are constitutional.

I am also in agreement with the majority that the prior record of disbarment may be considered in determining the appropriate discipline for Mr. Goodrich, but I am not in agreement that it should be considered in determining his guilt. The Ferguson case was investigated by the Grievance Committee some three years ago on the complaint of John Ferguson. Following a full disclosure of the handling of the accounts, John Ferguson withdrew his complaint. Dr. James Ferguson moved back to Australia and John Ferguson died. The file of the Grievance Committee was closed.

Upon a second complaint being filed in 1972 in the Bosanco case, which the referee heard and found to be "not proven", the Ferguson case was resurrected and now is the basis of John Goodrich's disbarment. If the Ferguson case was to be the basis of disbarment, it should have been prosecuted in 1971 when the Fergusons were available to testify. The renewal of these charges after almost three years have elapsed denies to Mr. Goodrich very fundamental rights. I must respectfully dissent.

WINANS, Justice (dissenting).

I concur in the dissent of Justice Dunn. Also I am in agreement with the majority that our disbarment procedures are constitutional. I would add but a short statement as background. The referee made rather short shrift of the Bosanco charge and I think he was correct in so doing. Whatever complaint was originally made by Dr. Ferguson or his brother John or both against John Goodrich appears to have been completely adjusted and settled among themselves. This is borne out by an Exhibit

154

signed by Dr. Ferguson under date of June 16, 1971. It also appears that nearly one year earlier the office of the Attorney General of the State of South Dakota, by a letter addressed to the Chairman of the South Dakota Grievance Committee, dated August 26, 1970, was likewise satisfied with the explanation and showing made by Goodrich, through his attorney, of his conduct then under investigation. The last paragraph of the Attorney General's letter concludes with this statement:

"Unless this office is notified by either the Grievance Committee or the South Dakota Supreme Court that further action or investigation is required by the Attorney General, we will close our file in this case."

What I believe we have in this proceeding against Mr. Goodrich is a highly technical possible violation and a super-sensitive vindication of Canon 11 of Professional Ethics of the State Bar of South Dakota in force and effect in 1968 as set forth in the Court's opinion. I do not believe that the following language of such opinion is either justified or warranted by the record: "* * * and which $1,900 was procured through accused's deceit, fraud and misrepresentation." These are serious charges, the same on which the Attorney General had previously closed his files. I think the majority opinion goes too far and at too late a date. For these reasons, I dissent from the judgment of outright disbarment in this case.